[L.A. No. 31993. Sept. 12, 1985.]

In re ROBERT LEE NEVILL on Suspension.

COUNSEL

Charles M. Sevilla and Cleary & Sevilla for Petitioner.

Herbert M. Rosenthal, Truitt A. Richey, Jr., Ellen A. Pansky and JoAnne Earls Robbins for Respondent.

OPINION

**THE COURT.**—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar that Robert Lee Nevill be suspended

from the practice of law for five years on conditions of probation, including actual suspension for thirty months after his release from prison.[1] Petitioner was convicted of voluntary manslaughter (Pen. Code, § 192, subd. (a)) in the shooting death of his wife of 13 years. Upon review, we conclude that disbarment is the more appropriate discipline.

In the disciplinary proceedings below, petitioner and respondent State Bar entered into a "Stipulation as to Facts and Discipline." (See Rules Proc. of State Bar, rules 401-408.) The stipulation contains the following recital of the relevant facts leading up to and including the killing: "[Petitioner] and his wife, Marcie Nevill, began having marital difficulties in approximately August 1981. Some of these difficulties involved Mrs. Nevill's relationship with a male co-worker in her office. On November 20, 1981, [petitioner] picked up the couple's sixteen-month-old daughter from her nursery school and took her to Mrs. Nevill's office. He advised Mrs. Nevill that he and the child were leaving, then took the child home. Shortly thereafter, Mrs. Nevill left her office and also went home. [¶] When Mrs. Nevill arrived home, an argument ensued and [petitioner] shot his wife approximately ten times with a rifle in the bedroom of their house. Death was immediate. [Petitioner] telephoned the police, his mother, and his wife's office shortly after the shooting and advised them all that he had just killed his wife. [¶] Police officers arriving on the scene found Mrs. Nevill's body in the couple's bedroom. [Petitioner] was outside of the house holding his daughter. He appeared very upset and made numerous unsolicited and emotional statements such as 'I killed her,' 'I did it,' 'I was supposed to kill myself.' [Petitioner] was taken into custody immediately."

This rather abbreviated factual summary may be supplemented by reference to the trial transcript.[2] The transcript reveals the following facts: The Nevills' marital discord was compounded by each spouse's admitted infi-

---

[1] After the State Bar Review Department adopted the investigating referee's order approving a stipulation as to the facts and discipline, this court sent a letter advising Nevill that it was considering the imposition of more substantial discipline. Nevill then filed his petition for writ of review.

[2] Despite the existence of the stipulation, petitioner asks that we take judicial notice of the trial transcript and the opinion of the Court of Appeal affirming his manslaughter conviction. (Evid. Code, §§ 450, 452, subd. (d)(1), 459.) As a general rule, an attorney is bound by the factual recitals in a stipulation once the review department has approved it. (*Inniss* v. *State Bar* (1978) 20 Cal.3d 552, 555 [143 Cal.Rptr. 408, 573 P.2d 852]; Rules Proc. of State Bar, rule 401. See also *Giovanazzi* v. *State Bar* (1980) 28 Cal.3d 465, 470-471 [169 Cal.Rptr. 581, 619 P.2d 1005].) This rule, however, applies only to preclude the attorney from attempting to contradict the stipulated facts. By his request for judicial notice, petitioner wishes to supplement, not contradict the stipulated facts. (See *Wells* v. *State Bar* (1984) 36 Cal.3d 199, 207-208 [203 Cal.Rptr. 134, 680 P.2d 1093] [supplemental statement detailing events referred to in stipulation was properly before this court].) Judicial notice is therefore appropriate. (See also Bus. & Prof. Code, § 6102, subd. (d).)

delity, Mrs. Nevill's accelerated professional advancement, petitioner's lack of success as a lawyer[3] and his recent loss of a local election. Petitioner wanted his wife to quit work and stay home with their child. The couple argued, reconciled and argued again. After at least one such episode, petitioner became physically violent, throwing his wife down on a couch and striking her repeatedly.

On the morning of the killing, Mrs. Nevill declined petitioner's invitation to meet for lunch, telling him that her coworkers were taking her out to celebrate the start of her planned 30-day leave of absence. After she left for work, petitioner visited a friend who "knew a lot of people" to discuss locating someone to beat up Mrs. Nevill's lover and teach him to stay away from her. Petitioner and his friend smoked marijuana and used cocaine.

Petitioner next called his "paramour" to break a lunch date for that afternoon, falsely stating that he was waiting for a phone call "on a verdict." He then called Mrs. Nevill and renewed his invitation to meet for lunch. She declined.

Suspicious, petitioner drove to his wife's office, hid behind a bush and, using binoculars, observed her leaving with a man. Petitioner tried to follow the car but eventually lost track of it. He then had three drinks, returned to Mrs. Nevill's office and used more cocaine. After waiting some time, he drove to his daughter's nursery school, ostensibly to make sure that his wife had not taken her. Finding the child at the school he then took her with him and returned to Mrs. Nevill's office where he confronted her about her lunch date. Mrs. Nevill admitted that she had lied.

Petitioner then announced that he was leaving Mrs. Nevill and taking the child with him. Mrs. Nevill expressed concern that the child was becoming a pawn in their dispute[4] but agreed to move with him for a trial period.

Petitioner put the child in the car and sped home, hoping that Mrs. Nevill would follow. While waiting for her to arrive, he placed a rifle on top of the bed concealing it with a sheet. He began packing and used more cocaine.

When Mrs. Nevill arrived, alone, the couple argued. Petitioner accused her of being seen going into a hotel with the other man. She allegedly responded that she had not slept with the man "this week." Petitioner then told her to call the other man, which she attempted to do without success.

---

[3]Petitioner was admitted to the California Bar on December 21, 1977.

[4]At trial petitioner admitted that he had been using the child as a pawn throughout the couple's marital difficulties.

Finally, petitioner grabbed the rifle and fired three shots into the bedroom floor. Mrs. Nevill, seated on the bed, called out, "you really are crazy aren't you?" Petitioner immediately turned the gun on her, shooting her 10 or 11 times. He then called the police and Mrs. Nevill's parents, and was subsequently taken into custody.

Petitioner was charged with murder (Pen. Code, § 187). At trial, Dr. Randolph Reed, a forensic psychiatrist who had examined petitioner and conducted a sodium amytal interview with him, testified for the defense that petitioner had a "mixed personality disorder," which meant he was a "psychologically weak, immature, and fragile individual" who dealt with problems in a childlike fashion. Reed opined that this disorder did not cause the shooting, but it contributed to petitioner's inability to handle significant stress. Reed concluded that petitioner was coming apart psychologically before the killing and, therefore, did not have the capacity to intend to kill.

After the jury returned a verdict of voluntary manslaughter, the trial court sentenced petitioner to the upper term of six years plus an additional two years for using a firearm. Upon notice of conviction, this court referred the matter to the State Bar for a report and recommendation as to whether the facts and circumstances surrounding the commission of the crime involved moral turpitude or other misconduct warranting discipline. (Bus. & Prof. Code, § 6102, subds. (a) and (c); *In re Rothrock* (1940) 16 Cal.2d 449, 455 [106 P.2d 907, 131 A.L.R. 226].)

Petitioner and the principal referee for the State Bar entered into the "Stipulation as to Facts and Discipline" referenced above. In addition to the factual statement, the stipulation contains a "Statement of Mitigating Circumstances," which recites what petitioner would have testified to had he been called as a witness in the disciplinary proceedings. In summary, petitioner would have testified that: a confluence of factors contributed to the marital disharmony; Mrs. Nevill had asked for a separation and then changed her mind, promising to stay home and forget the other man; petitioner feared losing his child and had made efforts to obtain marriage counseling; petitioner only took his daughter from the nursery school because she cried to go with him; he secreted the rifle under the sheet to scare Mrs. Nevill's boyfriend in case the couple tried to take the child from him; immediately after killing Mrs. Nevill he was "an emotional basket case" and planned to kill himself; and, Dr. Reed diagnosed petitioner as having a "mixed personality disorder" which prevented him from being "able to deal with relationships or stress in a realistic fashion."

The stipulation does not include an explicit finding regarding moral turpitude; rather, it contains a simple statement that the killing "does involve

misconduct warranting discipline." The stipulation includes the following recommended discipline: five-year suspension stayed; probation for five years including thirty months actual suspension following petitioner's release from prison; quarterly reports to the State Bar as to his familiarity and compliance with the provisions of the State Bar Act and the Rules of Professional Conduct; abstinence from the "excessive use of intoxicants and mind- or mood-altering drugs" unless medically prescribed; and psychiatric counseling.

Upon the hearing panel's recommendation, the review department voted to approve the stipulation. Three of the review department referees voted against the stipulation on the ground that the recommended discipline appeared insufficient in view of the stipulated facts.

### I

In reviewing cases of attorney misconduct, this court attributes substantial weight to the State Bar's recommendations as to discipline. (*Olguin* v. *State Bar* (1980) 28 Cal.3d 195, 199 [167 Cal.Rptr. 876, 616 P.2d 858]; *Inniss, supra,* 20 Cal.3d at p. 558.) The court is duty bound, however, to exercise its independent judgment in determining the appropriate discipline in any given case. (*Garlow* v. *State Bar* (1982) 30 Cal.3d 912, 916 [180 Cal.Rptr. 831, 640 P.2d 1106]; *Weir* v. *State Bar* (1979) 23 Cal.3d 564, 576 [152 Cal.Rptr. 921, 591 P.2d 19]; *Jackson* v. *State Bar* (1979) 23 Cal.3d 509, 513-514 [153 Cal.Rptr. 24, 591 P.2d 47].) Because petitioner stipulated that his behavior constituted misconduct warranting discipline, our task is limited to adjudging what degree of discipline is warranted.[5]

The discipline ultimately imposed must be consistent with its purpose, that of protecting the public, the courts, and the legal profession from unfit practitioners. (*In re Possino* (1984) 37 Cal.3d 163, 168 [207 Cal.Rptr. 543, 689 P.2d 115].) In determining the extent of discipline to be imposed we must consider each case on its own facts (*Toll* v. *State Bar* (1974) 12 Cal.3d 824, 831 [117 Cal.Rptr. 427, 528 P.2d 35]), taking into account not only the offense itself, but also any aggravating or mitigating factors. (*Tarver* v. *State Bar* (1984) 37 Cal.3d 122, 133 [207 Cal.Rptr. 302, 688 P.2d 911].) "There are no fixed standards as to the appropriate penalty" in disciplinary actions. (*Alberton* v. *State Bar* (1984) 37 Cal.3d 1, 14 [206 Cal.Rptr. 373, 686 P.2d 1177].)

---

[5]The stipulation contains an introductory acknowledgment by the parties that this court is not bound by the State Bar's recommendation as to discipline and may increase or decrease the discipline accordingly.

■ In the instant case, the need to protect the public and the profession is great. The facts indicate that petitioner used his 16-month-old daughter as a pawn to lure his wife into what would be their final confrontation, secreted the rifle under a sheet to insure that he would maintain the upper hand in the anticipated hostilities over the child, and finally killed his wife in an extremely violent and frightening manner. By his actions, petitioner displayed a dangerous volitility which might well prejudice his ability to effectively represent his clients' interests given the pressures associated with the practice of law. Petitioner's professionally diagnosed childlike responses to the stresses of life heighten our concern. While " 'we are not insensitive to the personal and professional problems that frequently besiege the practitioner' " (*Tarver, supra,* 37 Cal.3d at p. 134), it is our duty to protect the public from those attorneys who, for whatever reason, are unable to cope with pressure and adversity. The safety of the public, and the integrity of the profession require no less.

For these reasons, we find the State Bar's proposed discipline inadequate. The degree of discipline ultimately imposed must, of necessity, correspond to some reasonable degree with the gravity of the misconduct at issue. Petitioner has committed the ultimate offense: the taking of a life. Two and one-half years actual suspension simply fails to attest to that fact. The circumstances surrounding petitioner's misconduct compel the conclusion that disbarment is the more appropriate discipline.

The factors offered in mitigation do not dissuade us from concluding that petitioner should be disbarred. Where an attorney's criminal act involves actual physical harm to a particular individual, the necessary showing of mitigating circumstances increases accordingly. (Cf. *In re Higbie* (1972) 6 Cal.3d 562, 574 [99 Cal.Rptr. 865, 493 P.2d 97]; *Sullivan* v. *State Bar* (1955) 45 Cal.2d 112, 119-120 [287 P.2d 778].) Any greater physical harm than that perpetrated in the instant case is inconceivable. In turn, the proffered mitigating circumstances are simply inadequate in the face of this harm.

In formulating the discipline recommendation, the principal referee appears to have considered as mitigating[6] the fact that petitioner: (1) was having marital problems caused in part by his wife's involvement with someone else; (2) used alcohol and cocaine on the day of the killing; (3) argued vehemently with his wife shortly before killing her; (4) admitted his guilt immediately after the crime; (5) was diagnosed as having a personality

---

[6]To what extent the hearing panel (or the review department) relied on these factors in reaching its ultimate recommendation is unclear. They appear in the "Statement of Mitigating Circumstances" contained in the stipulation, but that section simply recites what petitioner would have testified to had he been called as a witness.

disorder; and (6) is serving an eight-year sentence for the crime. Additionally, the State Bar asks us to consider as mitigating the fact that petitioner has never before been disciplined for unethical conduct, that he has been cooperative in this matter and that the killing is unrelated to the practice of law.[7]

Bearing in mind that present fitness to practice law is our primary concern (*Possino, supra,* 37 Cal.3d at p. 172; *In re Petty* (1981) 29 Cal.3d 356, 362 [173 Cal.Rptr. 461, 627 P.2d 191]), we cannot indulge the suggestion that these factors constitute adequate mitigation to preclude disbarment. Petitioner's marital problems and the events of the day in question do not mitigate petitioner's behavior; rather they serve to underscore petitioner's difficulties coping with stress. Likewise, petitioner's mental condition is not mitigating. In *Possino,* we expressly rejected the assertion that disbarment was inappropriate given the errant attorney's psychological condition, stating " '[w]e realize that in many cases psychoneurotic problems may underlie professional misconduct and moral turpitude. In this area our duty lies in the assurance that the public will be protected . . . rather than in an analysis of the reasons for his delinquency.' " (*Possino, supra,* 37 Cal.3d at p. 171. See also *In re Duggan* (1976) 17 Cal.3d 416, 423 [130 Cal.Rptr. 715, 551 P.2d 19]; *In re Fahey* (1973) 8 Cal.3d 842, 850, fn. 4 [106 Cal.Rptr. 313, 505 P.2d 1369, 63 A.L.R.3d 465]; *Grove* v. *State Bar* (1967) 66 Cal.2d 680, 685 [58 Cal.Rptr. 564, 427 P.2d 164].) Though petitioner's behavior may have been caused by his "personality disorder," that disorder will not preclude his disbarment.

Our responsibility to protect the public and the profession also prevents us, in the instant case, from looking to the lack of prior discipline and the fact that the offense is unrelated to legal practice as mitigating circumstances. While a "clean record" may be taken into account where an attorney's indiscretion is not great, where restitution has been made or where the attorney has been rehabilitated, "disbarment is not reserved for those possessing prior records." (*In re Weber* (1976) 16 Cal.3d 578, 582 [128 Cal.Rptr. 434, 546 P.2d 1378].) Where, as here, an attorney's misconduct is egregious and is not substantially mitigated by other circumstances, once is one time too many. (See *Benson* v. *State Bar* (1971) 5 Cal.3d 382, 388 [96 Cal.Rptr. 30, 486 P.2d 1230].) Likewise, that the crime is not directly related to the practice of law does not insulate petitioner from the appropriate discipline. (See *In re Rohan* (1978) 21 Cal.3d 195 [145 Cal.Rptr. 855, 578 P.2d 102].)

---

[7]Petitioner suggests that the circumstances of the crime, his candor and cooperation with the police and the State Bar and his remorse are all factors in mitigation. As these parallel the State Bar's list, we do not consider them separately.

While petitioner's admission of guilt and his candor and cooperation with the police, the courts and the State Bar may be viewed as factors in mitigation,[8] they pale in comparison with the egregious behavior from which they stem. The same is true of the fact that petitioner is serving an eight-year sentence for his crime. While criminal punishment is relevant to the determination of appropriate discipline, criminal punishment and attorney discipline serve two different purposes. (*In re Hanley* (1975) 13 Cal.3d 448, 455 [119 Cal.Rptr. 5, 530 P.2d 1381].) For our purpose, petitioner's criminal sentence is of limited import. Therefore, when put in perspective and balanced against the need to protect the public and the profession, we cannot afford these proffered mitigating factors sufficient weight to preclude disbarment.

Beyond the absence of adequate mitigation, disbarment is also appropriate as a cautionary measure. Given petitioner's uncontested volatility, his lengthy incarceration and his extended absence from practice, we can best achieve the goal of protecting the public by imposing discipline which incorporates some mechanism for future reevaluation of petitioner's fitness to practice law and attendant ability to cope with the stresses of everyday life. Disbarment provides such an opportunity for thorough reappraisal; the recommended discipline does not.

The State Bar's recommendation of five years' probation and two and a half years' actual suspension upon release from incarceration fails to accommodate the need for complete investigation and review prior to reinstatement. Once the five-year period had run its course, petitioner automatically would be reinstated as a member of the bar in good standing without a renewed inquiry into his then present fitness to practice.[9] The terms of the proposed probation—quarterly reports, abstinence from mind-altering drugs and psychiatric counseling—provide only insufficient assurance to the public and the profession that petitioner's inability to cope with stress or to control his emotions will have been remedied when the disciplinary period comes to a close. Even though the State Bar can, after formal hearing, revoke probation for good cause shown (Rules Proc. of State Bar, rules 611,

---

[8]In another factual context, we have held that restitution is no defense to disbarment when made under the pressure of a forthcoming State Bar disciplinary investigation. (*Sevin* v. *State Bar* (1973) 8 Cal.3d 641, 646 [105 Cal.Rptr. 513, 504 P.2d 449].)

[9]Under the State Bar proposal the five-year probationary period would commence on the date the order of this court becomes effective. Because petitioner is serving an eight-year sentence, the five-year probation conceivably could end before he had completed the two-and-one-half-year actual suspension. In that event he would be free to practice without any constraint two and one-half years after his release from prison.

612),[10] this safeguard offers no guarantee that even the most conscientious compliance with the conditions will produce the hoped-for rehabilitation.

Disbarment will better protect the public, the profession and the courts. Disbarment guards against the unfit practitioner until such time as he or she affirmatively demonstrates that the disability has been overcome. Requiring petitioner to make such a showing prior to readmission will assure that the discipline imposed has served its recognized purpose.

Although a disbarred attorney may seek reinstatement after five years, such reinstatement is not automatic. Once an attorney files a petition for readmission, the State Bar's Division of Trial Counsel conducts an exhaustive investigation into the applicant's fitness, at that time, to practice law. (See Rules Proc. of State Bar, rule 664.) A formal hearing is held at which interested parties may testify for or against readmission. (Rules Proc. of State Bar, rule 665.) The burden is on the attorney seeking readmission to demonstrate, to the satisfaction of a majority of the hearing panel, "(1) rehabilitation and present moral qualifications for readmission, and (2) present ability and learning in the general law." (Rules Proc. of State Bar, rule 667.) Having been disbarred once, the burden of proving good moral character is higher than when first admitted. (*Kepler* v. *State Bar* (1932) 216 Cal. 52, 55 [13 P.2d 509].) In addition, the attorney must pass the Professional Responsibility Examination and also may be required to retake the general bar examination. (Rules Proc. of State Bar, rule 667.)

In the instant case, this structured readmission process essentially combines the probation conditions proposed by the State Bar with the necessary opportunity for reassessment of petitioner's fitness to practice law should he wish to reenter the practice. Once disbarred, petitioner would be precluded from seeking reinstatement for five years from the effective date of our order. (Rules Proc. of State Bar, rule 662.) To demonstrate his rehabilitation and then present fitness to practice, petitioner would necessarily have to show that he had received and benefitted from psychiatric care and

---

[10]The probation monitor referee is charged with responsibility for making quarterly reports to the probation department as to "the progress of probation." (Rules Proc. of State Bar, rule 611(c).) The referee must periodically assess "the extent and degree of the probationer's compliance with the conditions of probation, and [determine] whether such compliance furthers the objectives of protection of the public and rehabilitation of the probationer." (Rules Proc. of State Bar, rule 611(d).) However, the referee may issue a "Notice to Show Cause why probation should not be revoked" *only* upon determining that the probationer has violated the conditions of probation *and* that revocation would further the purpose of the probation order. (Rules Proc. of State Bar, rule 611(e). See also rule 612.) The rules do not provide for revocation of probation when the rehabilitation objective of probation is not being met despite compliance with the probation conditions. This gap in oversight capacity is particularly worrisome where, as here, the attorney's misconduct is egregious and the result of a combination of nonquantitative factors.

no longer suffered a lack of emotional control or an overwhelming inability to cope with stress. Use of nonprescribed mind-altering drugs during the interim would reflect poorly on these efforts. Moreover, because the investigation and hearing would take place after petitioner was released from prison and had had the opportunity to readjust to life outside of an institutional setting, the hearing panel would be able to evaluate petitioner's ability to make that transition and cope in his new environment. Finally, after petitioner's extended absence from the law, his legal knowledge would be assessed. Each of these factors would weigh heavily in the determination of petitioner's then present fitness to practice law. If petitioner successfully carried his burden of proving his fitness at that time, then the public would be assured, to the greatest extent possible, of that fitness, and he would be readmitted.

The probation-temporary suspension scheme proposed by the State Bar requires compliance with its conditions, but stops short of requiring rehabilitation. Although this type of disciplinary program will be appropriate in many proceedings, it is inappropriate under the particular circumstances of this case. Given petitioner's volatility and the gravity of his offense, the added enforcement power available with disbarment is necessary for the protection of the public, the courts and the profession.

Petitioner is hereby disbarred on the effective date of this order. Petitioner is further ordered to comply with rule 955 of the California Rules of Court and to comply with subdivisions (a) and (c) of that rule within 30 and 40 days respectively after the effective date of this order.