674 So.2d 243 (1996)
In re Brenda M. BROWN.
No. 95-B-0817.
Supreme Court of Louisiana.
May 21, 1996.
*244 Gregory F. Gambel, New Orleans, Charles B. Plattsmier, Morgan City, G. Fred Ours, New Orleans, for Applicant.
Brenda M. Brown, New Orleans, Samuel S. Dalton, Jefferson, for Respondent.
JOHNSON, Justice[*].
Respondent, Brenda M. Brown, was formally charged with violating the Rules of Professional Conduct based on her conviction pursuant to a guilty plea for negligent homicide, a violation of La.R.S. 14:32.
On February 10, 1994, pursuant to Rule XIX, Section 19, respondent was suspended from the practice of law pending further orders of this court on the grounds of conviction of a serious crime. This court ordered the institution of the necessary disciplinary proceedings in accordance with Rule XIX, Sections 11 and 19.
On January 3, 1993, Brenda M. Brown was charged by bill of information with negligently killing Brenda Gills. On June 14, 1993, respondent entered a plea of guilty as charged. On August 10, 1993, she was sentenced to serve five years [1] in the custody of the Department of Corrections. The sentence was suspended and respondent was placed on five years active probation with the following conditions: (1) that she serve eighteen months in the custody of the parish prison without the benefit of any probation, parole, suspension, or good time; (2) respondent was ordered to perform 1,000 hours of community service with the Jefferson Parish Indigent Defender Program; and (3) respondent was ordered to participate in counseling.[2]
On March 10, 1994, respondent filed a petition for consent discipline wherein she requested that she be suspended from the practice of law for eighteen months retroactive to February 10, 1994, the date of the interim suspension. On that same date, disciplinary counsel filed a concurrence to the consent discipline of eighteen months. The matter was submitted directly to the disciplinary board which rejected the tendered consent discipline on May 16, 1994. The disciplinary board ordered the office of disciplinary counsel to proceed with the matter by institution of disciplinary proceedings against respondent pursuant to Rule XIX, Section 11, in accordance with the February 10, 1994, order of this court.
Thereafter, on May 26, 1994, formal disciplinary charges were brought against respondent which alleged that respondent was "convicted of a criminal offense which constitut[ed] *245 serious criminal conduct involving violation of Rule 8.4(b) of the Rules of Professional Conduct, and which adversely reflect[ed] upon [respondent's] moral fitness to practice law under La.S.Ct. Rule XIX, Sect. 19 B." Respondent filed an answer in which she admitted that she had been convicted of negligent homicide, but she denied that she lacked the moral fitness to practice law.
On August 11, 1994, a hearing was held before hearing committee # 11. The committee recommended an eighteen month suspension retroactive to the date of the interim suspension. Upon review, the disciplinary board, by a majority vote, recommended to this court that Brenda Brown be disbarred.
The sole concern before this court in this disciplinary proceeding is the determination of the appropriate sanction.
The hearing committee reviewed bar disciplinary decisions from other jurisdictions involving convictions for negligent homicide or vehicular homicide. These decisions suggest suspension as the appropriate sanction where there is a lack of "criminal intent" as an element of the crime for which the attorney has been convicted and the criminal conduct does not reflect on the attorney's fitness to practice law. In re Morris, 74 N.M. 679, 397 P.2d 475 (1964) (attorney suspended for indefinite period after pleading guilty to involuntary manslaughter resulting from death of five persons struck by attorney while driving intoxicated); In Matter of McGrath, 98 Wash.2d 337, 655 P.2d 232 (1982) (attorney disbarred after conviction for assault in the second degree resulting from attorney intentionally shooting another person outside of a bar); Disciplinary Proceeding Against Curran, 115 Wash.2d 747, 801 P.2d 962 (1990) (six month suspension given to attorney convicted of two counts of vehicular homicide resulting from driving while intoxicated). The hearing committee noted that, generally, an attorney is suspended for one to two years where the attorney has negligently caused the death of another while under the influence of alcohol. For guidance, the hearing committee also reviewed the ABA Standards for Imposing Lawyer Sanctions, Sections 5.11 and 5.12, which suggest disbarment when the criminal conduct includes "intentional killing" of another and suspension when the killing is not the result of criminal intent and the criminal conduct adversely reflects on the lawyer's fitness to practice. In the present case, the hearing committee concluded that an eighteen month suspension was appropriate placing great emphasis on respondent's lack of criminal intent and the lack of evidence that respondent's criminal conduct adversely reflected on her fitness to practice law.
The underlying circumstances of respondent's conviction are not analogous to a conviction resulting from a death caused by an intoxicated driver. A gun, unlike an automobile, is an inherently dangerous weapon.[3] When a gun is drawn against another person, intoxicated or not, the risk that someone could be seriously injured or killed is always present. Absent directing an automobile towards a person, an automobile does not present the same danger. Additionally, driving an automobile while intoxicated or in a negligent manner may evidence extremely poor judgment and reckless behavior, but it does not evidence a violent propensity. Absent a defect, a gun requires human volition to discharge. Accordingly, we find that the intoxicated driver cases reviewed by the hearing committee offer little guidance for determining the appropriate sanction in the present case.
The disciplinary board found that the hearing committee's recommendation failed to adequately address the fact that respondent's criminal conduct, intentional or not, resulted in Brenda Gills' death. Moreover, the board criticized the hearing committee's selection of bar disciplinary decisions from other jurisdictions. According to the board, the cases relied on by the hearing committee addressed similar issues regarding criminal intent, but the hearing committee failed to consider cases with similar facts, that is, violent death through the use of a deadly weapon. The board reviewed bar disciplinary decisions from other jurisdictions where an attorney has caused the death of another *246 person through the use of a deadly weapon and found that, under such circumstances, disbarment was generally imposed. In re Weber, 183 A.D.2d 349, 591 N.Y.S.2d 372 (1992) (disbarred attorney who shot his girlfriend in her dormitory and travelled with her body in a sleeping bag while he sold some of her belongings); In re Rowe, 80 N.Y.2d 336, 590 N.Y.S.2d 179, 604 N.E.2d 728 (Ct.App.1991) (disbarred attorney found not guilty by reason of insanity as to four counts of second degree murder resulting from attorney beating to death his wife and three children); In re Nevill, 39 Cal.3d 729, 217 Cal.Rptr. 841, 704 P.2d 1332 (Cal.1985) (attorney disbarred for conviction of voluntary manslaughter resulting from shooting his wife after arguing with wife over wife's infidelity).
The purpose of lawyer disciplinary proceedings is not primarily to punish the lawyer but rather to maintain appropriate standards of professional conduct to safeguard the public, to preserve the integrity of the legal profession, and to deter other lawyers from engaging in violations of the standards of the profession. Louisiana State Bar Ass'n. v. Guidry, 571 So.2d 161 (La. 1990).
It is professional misconduct for a lawyer to "[c]ommit a criminal act especially one that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects." Rule 8.4(b). La.R.S. 14:32 defines negligent homicide as "the killing of a human being by criminal negligence." La.R.S. 14:12 defines criminal negligence as existing "when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances." Conviction of a crime may warrant disbarment, even though the crime was not directly connected with the practice of law. Louisiana State Bar Ass'n. v. Frank, 472 So.2d 1 (La. 1985).
The facts and circumstances underlying the conviction are important in determining the appropriate sanction to be imposed. In re Patricia King, 94-0686 (La. 11/30/94), 646 So.2d 326. The discipline to be imposed depends upon the seriousness of the offense, fashioned in light of the purpose of lawyer discipline, taking into account aggravating and mitigating circumstances. Id.
At the disciplinary hearing, disciplinary counsel introduced exhibits to support the formal charges against respondent. These documents included the bill of information, the minute entry noting the guilty plea, the sentencing transcript, a copy of the police report, respondent's statement to the police, the original police report, the autopsy report, the order of interim suspension, and the disciplinary board's rejection of the consent discipline.
In the statement given to the police on January 3, 1993, the night of the incident, respondent said that she and the victim, Brenda Gills, lived together and had been in a relationship for four years. According to the respondent's statement, she and Brenda Gills had gone to a Saints game. Afterwards, they went to a local bar. Brenda Gills accused respondent of "flirting with others" that evening which resulted in an argument. Respondent and the victim returned home separately. When Brenda Gills arrived home she was angry with respondent and told respondent that this was the worst relationship that she had ever had. Respondent retreated to her bedroom and locked the door. Brenda Gills started "bamming" or "banging" on the door, so respondent let Brenda Gills enter. Respondent admitted that Brenda Gills was not threatening her in any way. Respondent stated that she believed that "this woman [was] just going off on [her] tonight. However, respondent also said in her statement that she "really thought that it might'd (sic) been a violent thing." Respondent stated that she picked up the gun from under the bed and "it went off." Respondent denied aiming the gun. Respondent called 911 and informed the operator that she had just shot somebody. Then, respondent went outside and started screaming for neighbors to come help her. An emergency medical service unit transported Brenda Gills to Humana Hospital *247 where she was pronounced dead a short time later as a result of a single gunshot wound to the right upper chest.
According to the narrative statement in the police report, when the officers arrived on the scene they were directed upstairs to respondent's bed room. The officers asked Brenda Brown about her involvement in the incident. In response, Brenda Brown said, "I shot my lover." When asked why, Brenda Brown responded by saying "We were arguing and I picked up the gun. The gun went off." Brenda Brown was placed under arrest.
At respondent's sentencing hearing, the trial judge stated that he had taken into consideration everything provided to him, including the facts of the case. After reading in open court respondent's account of the incident as transcribed in the statement given by respondent to the police on the night of the shooting, the trial court opined that the statement was at least equally consistent with manslaughter[4] as it was with negligent homicide and as equally consistent with a "passionate" shooting as with negligent homicide.
At the disciplinary proceeding, Brenda Brown testified on her own behalf. Generally, respondent's testimony provided a narrative of the facts. Respondent explained that the shooting was the result of stupidity and negligence. Respondent could not recall pulling the trigger and said that she did not intend for the gun to discharge. Moreover, respondent said that she did not intend to inflict any injury on Brenda Gills. However, respondent stated that Brenda Gills was afraid of the gun and she admitted retrieving the gun to convince Brenda Gills to leave the bedroom. At the time, Brenda Gills was unarmed and was not physically attacking respondent.
The transcript from the disciplinary proceeding reveals some inconsistencies between respondent's testimony and the statement she gave to the police on the night of the incident. Specifically, in her statement to the police, respondent said that she and the victim were "arguing." However, during the hearing, when asked whether she and the victim were arguing respondent said, "It wasn't an argument." Also, in her statement to the police, respondent portrayed Brenda Gills as the aggressor stating that Brenda Gills "came towards" her. Conversely, respondent testified at the hearing that the victim said something to the effect that "[t]his is the worst relationship I've ever been in. I'm getting my stuff and leaving," which suggests a retreat. To some degree, these inconsistencies call into question respondent's veracity.
At the hearing, respondent introduced evidence of mitigating circumstances, including her own testimony and an array of character witnesses appearing in person and through letters.[5] All of these witnesses testified as to her good character. Their views in this regard were not affected by respondent's conviction.
First, Judge Anita Ganucheau[6] testified that she had been acquainted with respondent *248 for approximately twelve years. Judge Ganucheau met respondent when respondent was a prosecutor in Juvenile Court. Subsequently, they became personal friends. Based on her professional and personal observations of respondent, Judge Ganucheau did not believe that respondent intentionally killed Brenda Gills. Judge Ganucheau testified that nothing would be gained by the profession or respondent if respondent was prohibited from practicing law.
Next, Judge Helen Ginger Berrigan, a United States District Court judge for the Eastern District of Louisiana, testified that she was a long time acquaintance of respondent's and knew her as a public defender with both the Orleans Parish and Jefferson Parish Public Defender's offices. Judge Berrigan was impressed with respondent as an attorney, particularly, respondent's compassion for her clients. According to Judge Berrigan, respondent enjoyed a good reputation in the legal community. Judge Berrigan's opinion regarding respondent's competency and integrity as a lawyer was unaffected by respondent's conviction.
Prior to her appointment to the federal bench, Judge Berrigan represented respondent in connection with the negligent homicide charge. Respondent called Judge Berrigan within a half hour of the occurrence to request her help. Judge Berrigan arranged for respondent's release on bond on the condition of her self-commitment to the state hospital in Mandeville, specifically, the psychiatric unit. At the time, respondent was extremely distraught, remorseful, and guilt ridden and Judge Berrigan and respondent's friends and family were concerned that respondent was suicidal. Respondent remained committed for approximately thirty days.
Judge Berrigan hired an investigator who, within twenty four hours of the shooting, interviewed patrons who had been in the lounge on the previous night and respondent's neighbors. As a result of the investigation, Judge Berrigan was convinced that this was an accidental shooting or a negligent homicide. Judge Berrigan found persuasive the lack of a history of any problems, respondent's distraught emotional state, respondent's prompt call to 911, and respondent's request for help from neighbors. Judge Berrigan provided the district attorney's office all of the information gathered during the investigation. The district attorney's office conducted an independent investigation and, as a result, charged respondent with negligent homicide. According to Judge Berrigan, no plea bargain was involved and respondent did not receive any favorable treatment because of her former position with the district attorney's office or the public defender's office. In fact, Judge Berrigan opined that the district attorney's office scrutinized the evidence closely because of respondent's prior work with the district attorney's office and public defender's office. Respondent pled guilty as charged without having any agreement or discussion with the court or district attorney's office regarding the sentence.
Richard M. Thomas, Chief Indigent Defender for the 24th Judicial District Indigent Defenders Board, testified that Brenda Brown was a member of his staff for approximately three years. During her employment, respondent had a good working relationship with the other attorneys and her performance was beyond reproach. Mr. Thomas did not believe that respondent's conviction was related to her ability to practice law and he said that he would rehire respondent if he had the opportunity.
Phyllis Campo, an expert clinical social worker, has counseled respondent since the shooting. Ms. Campo opined that respondent is truly remorseful for the death of Brenda Gills and that respondent has demonstrated an ardent desire to rectify the harm that she has caused by trying to "put back into society what she felt she had taken out." Ms. Campo believed that the shooting incident was an isolated event which was out of *249 character for respondent. Ms. Campo did not know of any information which would make respondent unable or unfit to practice law.
Denise LeBoeuf, a staff attorney with the Loyola Death Penalty Resource Center, knew Brenda Brown from her work with the Jefferson Parish Indigent Defender's Program. Ms. LeBoeuf thought that respondent was a helpful, competent attorney who was very generous with her time. Ms. LeBoeuf did not know of any reason why respondent should be prohibited from practicing law.
Subsequent to the conviction, respondent became employed by the United Medical Center of New Orleans. Initially, respondent was hired as a collection worker. However, within one year of her employment, respondent advanced into management. The Chief Executive Officer, Chief Operating Officer and Business Office Director testified at the hearing. These three witnesses consider respondent to be an honest and hard working employee. Moreover, although they were aware of respondent's conviction, it did not affect their positive opinion regarding her moral turpitude.
As a mitigating factor, respondent also cites her lack of intent to kill the victim. Although Brenda Brown may not have intended to kill Brenda Gills, at the very least she exercised extremely poor judgment and a violent propensity in brandishing a gun in an effort to scare someone she professed to have loved. Moreover, the gun, an inanimate object, did not kill Brenda Gills. Brenda Brown killed Brenda Gills. The gun required human volition and Brenda Brown's overt action to kill.
The mitigating factors presented by respondent such as remorse, the absence of a prior disciplinary record, respondent's cooperative attitude, and the imposition of other penalties pale in comparison to respondent's criminal conduct. Here, the seriousness of the consequences of respondent's conduct cannot be overstated. She pled guilty to negligent homicide. The gravity of the crime reflects heavily on respondent's fitness to practice law. We cannot overlook the fact that respondent's actions resulted in the senseless destruction of a life and will obviously forever change the lives of the victim's family, particularly, the victim's minor children. The actual resulting injury could not have been more severe. Moreover, respondent demonstrated a violent reaction to an admittedly non-threatening situation. Her response to this apparently stressful situation creates concern regarding her continued ability to represent clients given the pressures associated with the practice of law. The sanction imposed must, of necessity, reasonably correspond with the gravity of the misconduct. Accordingly, under the circumstances of this particular case, we conclude that respondent's conviction of negligent homicide warrants disbarment. Any sanction less than disbarment would certainly deprecate the seriousness of the offense. Moreover, we find the presence of aggravating circumstances, specifically, respondent's motive in brandishing the gun to scare the victim and the vulnerability of the victim, a loved one of the respondent's who apparently felt safe in entering respondent's bedroom once respondent opened the door, support disbarment. Because of the gravity of the crime and the lack of mitigating circumstances relating to the crime itself, we conclude that disbarment is the appropriate discipline and that any evidence relating to respondent's good character can be raised if respondent applies for reinstatement after the passage of the minimum period of time following disbarment.

DECREE
For the reasons assigned, it is ordered, adjudged and decreed that Brenda M. Brown be and she is hereby disbarred from the practice of law, effective from the date of her interim suspension by this court on February 10, 1994. All costs of this proceeding are assessed to respondent.
DISBARMENT ORDERED.
LEMMON, J., concurs.
CALOGERO, J., not on panel.
NOTES
[*] Judge Burrell J. Carter, Court of Appeal, First Circuit sitting by assignment in place of former Justice James L. Dennis.

Calogero, C.J. not on panel. Rule IV, § 3.
[1] The maximum sentence for negligent homicide is five years, with or without hard labor. La.R.S. 14:32.
[2] On appeal, respondent's sentence was vacated and the matter was remanded for resentencing. State v. Brown, 93-2305 (La.App. 4th Cir. 11/17/94), 645 So.2d 1282. On remand, respondent was sentenced to four years and three months hard labor, suspended, and placed on five years active probation with a $20.00 per month supervisory fee conditioned on the following: (1) defendant is to serve nine months in parish prison with credit for time served from the date of arrest; (2) defendant is to serve the next two years and four months of weekends in parish prison; (3) defendant is to perform 2,000 hours of community service with the No Aids Task Force; and (4) defendant is to re-imburse the victim's family for out-of-pocket funeral expenses, pay $350 to the judicial expense fund, and pay $150 to the indigent transcript fund.
[3] La.R.S. 14:2(3) defines dangerous weapon as including any "instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm."
[4] La.R.S. 14:31 provides, in pertinent part, as follows:

A. Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm.
[5] A handwritten note from Councilman Johnny Jackson expressed his intent to support Brenda Brown in connection with the disciplinary proceeding, but a prior engagement prevented him from appearing at the hearing.
[6] In its recommendation to this court, the disciplinary board expressed concern regarding the voluntary nature of the testimony given by Judges Ganucheau and Berrigan. Specifically, the disciplinary board questioned whether these judges testified without being subpoenaed in violation of the Code of Judicial Conduct, Cannon 2. In response, respondent, through counsel, filed a motion seeking to strike the board's statements expressing concern regarding possible judicial misconduct. Furthermore, respondent requested that this matter be remanded to the board for a recommendation that includes the evidence adduced through the judges testimony. We find that nothing in the record suggests that the subpoenas were not served. Moreover, the record does not reveal any impropriety on the part of these judges. Accordingly, it is appropriate for this court to consider their testimony in determining the appropriate sanction and, consequently we hold that is unnecessary to remand this matter to the board.