[L.A. No. 32327. Nov. 30, 1987.]

In re EDWARD J. BLOOM on Disbarment.

130

COUNSEL

Edward J. Bloom, in pro. per., for Petitioner.

Herbert M. Rosenthal, Truitt A. Richey, Jr., and Richard J. Zanassi for Respondent.

OPINION

THE COURT.—This is a proceeding to review the recommendation of the State Bar Court that petitioner Edward J. Bloom, a member of the State Bar who was convicted of several federal felony offenses, be disbarred. We conclude that disbarment is appropriate.

PROCEDURAL HISTORY

Petitioner's federal convictions arise out of his involvement in a scheme to transport explosives to Libya. He was charged, together with other defendants, in four counts of a five-count indictment, with conspiracy to commit offenses against the United States (18 U.S.C.A. § 371), with presenting a false writing to an agency of the United States (18 U.S.C.A. § 1001), with unlawful export of an article on the United States Munitions List without an export license (22 U.S.C.A. § 2778(c)), and with unlawful transportation of hazardous materials by cargo aircraft (49 U.S.C.A. § 1809(b)). Petitioner's defense was that he believed in good faith, as he alleged that others involved represented to him, that the scheme was an authorized operation of the National Security Council and therefore legal. Petitioner waived jury trial and was found guilty by the court on all four counts.

Petitioner was sentenced to two years imprisonment on each count, the sentences to run concurrently. He was placed on supervised probation for

five years. He appealed his convictions to the Fifth Circuit Court of Appeals, which affirmed the judgment. His petition for rehearing was denied, and his petition for writ of certiorari to the United States Supreme Court was denied.

Following petitioner's convictions, this court imposed an interim suspension and referred the matter to the State Bar for a report and recommendation as to discipline. (Bus. & Prof. Code, § 6102, subd. (e); Cal. Rules of Court, rule 951(c).)

The Hearing Panel of the State Bar Court filed a decision unanimously recommending that petitioner be disbarred. The review department adopted the hearing panel's findings of fact and conclusions without change, and by a vote of 10 to 3 recommended that petitioner be disbarred. (The three dissenting members did so on the ground the evidence was insufficient to show petitioner had acted for reasons involving moral turpitude.)

FACTS

Petitioner was admitted to practice in California in 1932. He has no record of prior discipline.

The hearing panel's findings of fact relating to the offenses showed: Jerome Brower had been petitioner's client for about eight years. Brower owned a business dealing in explosives and other chemicals. One of the explosives Brower dealt with was a plastic explosive known as composition C-4, an item enumerated on the United States Munitions List which may not be exported without a license from the Department of State.

Brower had met Edwin P. Wilson in 1976. In 1977, Brower and Wilson had a meeting in Washington, D.C. with some Libyan nationals. Wilson wanted to obtain some C-4 explosives for shipment to Libya. Brower agreed to obtain 42,300 pounds of the plastic explosive for Wilson.

Payment was made in advance by deposit to Brower's Swiss bank account on which petitioner was a signatory. Petitioner made a trip to Europe and picked up money from the Swiss bank account to pay for the explosives. Brower arranged to purchase the C-4 explosives from three different manufacturers. Petitioner hand-carried money from the Swiss bank account funds to each of the three manufacturers in payment for the explosives.

Brower had possession of the explosives at his facilities in California. The explosives were repackaged in five-gallon pails and covered with a layer of putty, both to disguise the contents and to prevent damage in transit. The

pails of explosives were mislabeled as "drilling mud." Petitioner suggested that the labels should read "explosives," but Brower declined the suggestion.

Brower decided that the explosives should be shipped to Libya from Houston, Texas, because security was not as great at Houston as at other airports. At Brower's request, petitioner made arrangements to hire a trucking firm to haul the pails of explosives from California to Houston.

When the explosives arrived in Houston, no provisions had been made for their transportation to Libya. Brower borrowed $82,000, and gave it to petitioner with instructions to arrange for an airplane to transport the explosives to Libya. Petitioner went to Miami, Florida, where he arranged for the lease of an airplane. Petitioner did not inform the aircraft company that the plane would be used to transport explosives; he stated the cargo was to be drilling supplies. Petitioner refused to sign the lease himself, so another coconspirator signed it. The lease showed the destination as "Lisbon and beyond" rather than Libya, although petitioner was aware that Libya was the true destination.

On the trip from Miami back to Houston, petitioner offered to go to Washington, D.C. to "go through the rigmarole" necessary to obtain State Department permits for the shipment. His offer was declined.

When the leased airplane arrived in Houston, the pails of explosives were loaded on board. A false export declaration was filed with the United States Customs Service, showing that drilling mud was being exported to Lisbon. Petitioner was in possession of a copy of the false declaration, which he gave to Brower.

Petitioner rode in the airplane to Lisbon, sitting on one of the pails of explosives. Brower joined the flight in Lisbon, and both Brower and petitioner rode in the plane to Libya. Brower paid petitioner $10,000 for his part in the transaction.

Petitioner admitted he knew the explosives were exported to Libya, concealed and mislabeled as drilling mud. He admitted he knew the explosives could not legally be transported by cargo aircraft. However, he attempted to justify his actions on the ground that he believed in good faith that the transaction had been ordered by the National Security Council, and was therefore legal. He testified that Brower told him the shipment was a National Security Council operation, and gave petitioner a silver medallion which Brower told him was a National Security Council identification piece. Brower allegedly told him that, if anyone from the United States

Customs Service or the Bureau of Alcohol, Tobacco and Firearms inquired about the shipment, to show them the medallion and they would "go away." However, Brower denied that he told petitioner the National Security Council had authorized the transaction. Brower also denied telling petitioner the medallion was a National Security Council identification piece. He further testified that it was petitioner who had asked him for the medallion, possibly even after the explosives shipment had taken place.

DISCUSSION

Petitioner raises numerous objections to the hearing panel's findings of fact subsequently adopted by the review department. Petitioner's objections are without merit.

For example, petitioner denies he hand-carried payments from the Swiss bank account funds to pay for the explosives purchased from three supplier companies. He states in one case that the payment was for "TNT" and in another that the Swiss bank account funds were mailed by the Swiss bank, not hand-carried by petitioner. Brower and two of the suppliers testified, however, that petitioner hand-delivered funds in payment for the C-4 plastic explosives.

Similarly, petitioner argues that the record does not show that Brower expressly told petitioner he would not change the labels on the pails to state they contained explosives. Nevertheless, petitioner was in sufficient proximity to the pails when they were loaded on board the aircraft to know that the labels had not been changed. In fact, although petitioner additionally argues that he did not "arrange" for the lease of the aircraft (it had already been arranged and the lease previously drawn up) but only supplied the funds to close the deal, the aircraft company's agent testified that petitioner did most of the talking and was at least present when the agent was told the cargo consisted of oil drilling equipment. Thus, petitioner was aware even before he saw the pails loaded onto the aircraft that (1) they were originally mislabeled and (2) the cargo was deliberately misdescribed to the aircraft company consistent with the prior mislabeling.

Although petitioner denies he negotiated the lease of the aircraft, both petitioner and the aircraft company's attorney discussed the terms and agreed between them to add the words "and beyond" to show the destination as "Lisbon and beyond," even though petitioner knew the true destination was Libya.

Petitioner argues there is no evidence that he had any conversation with Wilson's people about the State Department permits during the flight from

Miami back to Houston. To the contrary, one of Wilson's men specifically testified to such a conversation.

Petitioner's other contentions in a similar vein are likewise without merit, and several other objections relate to trivial details that do not affect the basic substance of the findings. The findings are amply supported by the evidence.

Indeed, petitioner has never denied that he did the basic acts ascribed to him. The sole issue at petitioner's trial and before the State Bar in these proceedings was whether petitioner acted in the good faith belief that the transaction was authorized by the National Security Council. This credibility issue was resolved against petitioner at his trial, and the hearing panel also specifically found that petitioner's good faith defense was incredible. ■ While we independently determine the facts (*Alberton* v. *State Bar* (1984) 37 Cal.3d 1, 11 [206 Cal.Rptr. 373 686 P.2d 1177]), the hearing panel's greater opportunity to observe and judge the credibility of witnesses requires that great weight be given to its factual findings (*Tomlinson* v. *State Bar* (1975) 13 Cal.3d 567, 578 [119 Cal.Rptr. 335]). Therefore, to the extent that petitioner's objections rest upon a reassertion of the good-faith-belief defense that has twice been resolved against him, the objections fail.

■ Petitioner disputes the conclusion his acts involved moral turpitude. However, petitioner's convictions, especially of those offenses requiring a specific intent, presume knowledge of the falsity of certain facts or documents, or of the illegality of certain conduct. Petitioner was aware the explosives were mislabeled; he was at least present when representations were made, if he did not himself represent, to the aircraft company that drilling equipment and not explosives was to be transported in the cargo aircraft; he was present when the mislabeled cans of explosives were loaded onto the aircraft; and he even sat on one of the cans of "drilling mud" all the way to Libya. He knew that explosives could not legally be carried on board a cargo aircraft and he knew that the explosives could not be exported to Libya without a State Department permit. Petitioner's good-faith-belief defense is the only basis upon which it could be found his acts did not involve moral turpitude, but that defense was discredited both by the trial court and by the hearing panel, and on the basis of the evidence presented will not be credited by this court. Thus, petitioner's acts involved moral turpitude.

■ Petitioner further urges in connection with his good-faith-belief defense that he was not permitted to properly develop his defense at trial. He advised the trial court, in accordance with the Classified Information Procedures Act, that he intended to introduce possibly classified information at

his trial—i.e., the medallion. The court determined that the medallion was not classified material, based on the affidavit of a Department of Justice security officer that the medallion was not classifiable material, but was probably simply a one-ounce silver bullion round struck at a private mint. The security officer's affidavit was based on his inquiries to the United States Customs Service and the Bureau of Alcohol, Tobacco and Firearms (the agencies to whom Brower allegedly told petitioner to show the medallion to make them "go away" if they inquired about the explosives shipment) and to a numismatic expert in the United States Secret Service. Petitioner contends the government was obliged to inquire of the National Security Council, the alleged issuing agency, whether the medallion was a valid identification piece of that agency.

Petitioner misapprehends the import of the trial court's ruling. The Classified Information Procedures Act (18 Appen. U.S.C.A. Unannot. Text (1987 pocket supp.) p. 302, Pub.L. No. 96-456 (Oct. 15, 1980), 94 Stat. 2025) is designed to protect potentially classified material. The trial court here simply made a ruling as a preliminary matter that the procedures prescribed in the act for the protection of classified information need not be employed in petitioner's trial. It did not make a substantive ruling that the medallion was not a National Security Council identification piece or that petitioner could not reasonably have believed it was. The government did not introduce the security officer's affidavit into evidence at petitioner's trial.

Petitioner's defense was based on a good faith belief, not on the actual truth of Brower's alleged representation. Petitioner had a full opportunity to develop this defense. The trial court and the hearing panel simply did not believe petitioner's defense.

The State Bar has reviewed the case and recommended that petitioner's offenses warrant disbarment. ■ The State Bar's reconmendations as to discipline are entitled to great weight. (*Olguin* v. *State Bar* (1980) 28 Cal.3d 195, 199 [167 Cal.Rptr. 876, 616 P.2d 858].) Nevertheless, we must exercise independent judgment in determining the appropriate discipline in any given case. (*Chefsky* v. *State Bar* (1984) 36 Cal.3d 116, 121 [202 Cal.Rptr. 349, 680 P.2d 82].) ■ Although petitioner offers as mitigating factors his advanced age (nearly 80) and his lack of prior discipline since being admitted to the bar 55 years ago, he has been convicted of several serious federal offenses which we have determined under the facts of this case involved moral turpitude. Petitioner's good-faith-belief defense having been twice discredited, no other conclusion remains than that he willingly participated in a scheme of deceptions and misrepresentations, including the deliberate falsification of documents, and that he knowingly participated in the unlaw-

ful shipment of restricted munitions to foreign nationals. Such conduct is inimical both to the high ethical standards of honesty and integrity required of members of the profession and to promoting confidence in the trustworthiness of members of the legal profession. Neither did petitioner do any great service to his client by willingly participating in a criminal conspiracy. Petitioner has failed to show, in light of the disciplinary objectives of protecting the public, promoting confidence in the legal profession and maintaining professional standards, that the recommendation of the State Bar is erroneous. We therefore determine in the exercise of our independent judgment that disbarment is appropriate.

DISPOSITION

Accordingly, it is ordered that petitioner Edward J. Bloom be disbarred from the practice of law and that his name be stricken from the roll of attorneys. It is further ordered that petitioner comply with the requirements of rule 955 of the California Rules of Court and that he perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, after the effective date of this order. This order is effective 30 days after the filing of this opinion.