[No. S005981. Apr. 3, 1989.]

In re BURTON ROBERT BERMAN on Disbarment.

COUNSEL

Kenneth D. Noel for Petitioner.

Diane C. Yu, Truitt A. Richey, Jr., Richard J. Zanassi and Victoria Molloy for Respondent.

OPINION

THE COURT.*— We review the recommendation of the Review Department of the State Bar Court (hereinafter department) that petitioner Burton Robert Berman be disbarred from the practice of law in California. Berman maintains that certain recordings and transcripts of numerous telephone conversations and meetings were improperly admitted into evidence at his

*Before Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., Eagleson, J., Kaufman, J., and Puglia (Robert K.), J.†

†Presiding Justice, Court of Appeal, Third Appellate District, assigned by the Chairperson of the Judicial Council.

State Bar hearing. He requests that his case be remanded for further consideration absent such evidence. After considering the record and Berman's objections, we conclude that the department's findings and its recommendation of disbarment are appropriate.

## I. FACTS

Burton Robert Berman was admitted to the California State Bar on June 29, 1973. During all relevant times, Berman was the general counsel and part owner of Champion Mortgage Company, which marketed and serviced mortgages and loans secured by trust deeds on real property.

Berman first came to the attention of the Federal Bureau of Investigation (FBI) in June 1981. At that time the FBI was investigating an individual who had financial dealings with a company Berman represented. Although that investigation did not result in criminal proceedings against Berman, the FBI subsequently began a separate investigation of him. The subsequent investigation of Berman commenced after he told FBI informant James Fallacaro that he was looking for contacts with bankers, Wall Street brokers and drug dealers interested in investing in an offshore deal.

The FBI investigation occurred from approximately September through December 1982 and involved two agents: John Hanlon and Robert Cassidy. Agent Hanlon worked undercover, posing as a person with connections to banks in Florida and contacts with persons involved in illegal activities. Agent Cassidy, also working undercover, posed as a person interested in "laundering" money earned through the trafficking of illegal drugs. James Fallacaro, an FBI informant posing as a person with contacts in the financial centers of New York and Miami, was also involved in the investigation.

The investigation involved numerous meetings and telephone conversations between the FBI agents and Berman and Vincent Coniglio, who was Berman's business partner. During these conversations Berman proposed a scheme to "launder" money earned through the sale of illegal drugs. The scheme, as described by Berman, involved setting up a corporation in the Grand Cayman (the offshore corporation). The offshore corporation would have a bank account at the Royal Bank of Canada. The plan involved moving money earned through the unlawful sale of drugs from the United States to Canada without reporting the transfer to United States officials as required by law. The money would be put into the Royal Bank of Canada account, transferred to the offshore corporation and then used to purchase mortgages from Champion Mortgage Company. Champion Mortgage Company would service the mortgages, accepting payments, deducting its commission and depositing the balance in the Royal Bank of Canada account. Berman represented to agents Hanlon and Cassidy that there would

be no way to trace the funds to Cassidy and that all transactions would appear to be the legitimate business dealings of an offshore corporation.

To demonstrate the feasibility of his plan, Berman explained to agent Hanlon how to take $3 million and deposit it into an account at the Royal Bank of Canada. Although Berman refused to actually carry the money across the United States-Canadian border, he and Coniglio agreed to meet agent Hanlon in Canada in order to facilitate opening the bank account with Berman's contact at the Royal Bank of Canada. As part of the investigation, agent Hanlon later explained to Coniglio that he had been caught while attempting to carry the $3 million across the United States-Canadian border. When Berman discovered that agent Hanlon had been unable to carry the money across the border, he proposed transferring the money through United States branch offices of the Royal Bank of Canada or through banks in Mexico.

Berman also sought to have agent Hanlon present the combined financial statement of Champion Mortgage Company and Energy Plus, a company owned by a Luis Barcello, to banks and other financial institutions in order to induce loans and other forms of credit. During the course of the investigation Berman requested that agent Hanlon assist him in updating the combined financial statement.[1] Berman expressed little concern when informed by agent Hanlon that the updated combined financial statement would contain false information. Moreover, Berman indicated that he wanted the statement to show "heavy cash" in order to enhance the chances of obtaining loans and other forms of credit. Berman requested agent Hanlon to give the updated statement, which was to contain false financial information, to agent Hanlon's contacts in the Florida banking industry.

Throughout the investigation, most of the conversations between Berman and the FBI agents were tape recorded. Transcripts of the conversations were then made from the tape recordings. There are recordings and transcripts of three meetings in which agent Hanlon and Berman participated. At two of these meetings agent Cassidy was also present. The recordings and transcripts of the telephone conversations also include at least eight separate conversations between Berman and agent Hanlon. In addition, several telephone conversations between Berman and informant James Fallacaro were recorded.

---

[1] Although unclear, the evidence elicited at the State Bar hearing indicates that the combined financial statement as originally provided to agent Hanlon by Berman probably contained misleading information. The financial information on Champion Mortgage Company was apparently accurate. However, the financial information on Energy Plus had apparently become "stale." It is unclear whether Berman knew at the time he first provided the combined financial statement to agent Hanlon that the financial information on Energy Plus was no longer current.

On or about June 16, 1983, Berman was indicted in the United States District Court, Southern District of Florida.[2] The five-count indictment against Berman included charges of: (1) knowingly and intentionally making false statements and reports and willfully overvaluing properties or securities for the purpose of influencing the actions of certain financial institutions upon an application for loans, warehousing lines of credit and commitments, in violation of 18 United States Code sections 2 and 1014; and (2) conspiracy to knowingly and intentionally travel in interstate and foreign commerce and use facilities in interstate and foreign commerce with the intent to distribute the proceeds of unlawful activities, in violation of 18 United States Code sections 371 and 1952.

Berman thereafter entered into a plea bargain with the United States Attorney whereby he agreed to plead guilty to knowingly and intentionally conspiring to transport monetary instruments of more than $5,000 at one time from a place in the United States to or through a place outside the United States without filing a report as required by law, in violation of 18 United States Code section 371 and 3-1 United States Code sections 5316 and 5322(a). On January 13, 1986, Berman pled guilty and was sentenced to one year imprisonment stayed on conditions of probation, including thirty days' actual confinement and a five-year period of probation, and was fined $1,000.

## II. State Bar Proceedings

The State Bar conducted hearings on July 21, July 23, and August 7, 1987. Berman did not testify at the hearing; the only witness was agent Hanlon, who testified extensively as to his participation in the investigation. Over Berman's objection, the hearing referee admitted into evidence the tape recordings and transcripts of telephone conversations occurring between September 20, and December 14, 1982. Also admitted into evidence over Berman's objection were the recordings and transcripts of the three meetings occurring on November 2, November 16, and December 16, 1982. Prior to testifying agent Hanlon reviewed the recordings and transcripts of the telephone conversations and meetings in order to refresh his recollection of the events.

Based upon the evidence presented, the hearing referee concluded that Berman's conduct involved moral turpitude. The referee also noted that Berman had been publicly reproved by the State Bar of California on May 17, 1982, for willfully failing to perform all the services for which he was retained. The referee stated that while this prior disciplinary action was remote as to subject matter, it was relevant as to time because Berman

---

[2] Vincent Coniglio and Luis Barcello were indicted along with Berman.

undertook the present course of conduct within a few months of receiving the reproval. For these reasons, the referee recommended that Berman be disbarred.

The review department agreed with the referee's opinion, making only slight changes to it. The department concluded that Berman's actions were intended to assist drug dealers in laundering funds from their unlawful activities; that Berman *believed* that the financial statements to be created by the FBI agents would contain false information and intended that these statements be submitted to banks or other financial institutions to induce loans and other forms of credit for Champion Mortgage Company; and that Berman acted for the purpose of achieving his own financial gain. In addition, the department noted that the only evidence of mitigation submitted by Berman was that he was 63 years old and had 3 children ranging in age from 20 to 28.

## III. DISCUSSION

In reviewing the findings of the department, this court must exercise its independent judgment to determine whether the facts and circumstances of Berman's case justify the discipline recommended. (*In re Ford* (1988) 44 Cal.3d 810, 815 [244 Cal.Rptr. 476, 749 P.2d 1331]; *In re Vaughn* (1985) 38 Cal.3d 614, 618 [213 Cal.Rptr. 583, 698 P.2d 651].) However, the department's recommendation is entitled to great weight, and it is Berman who bears the burden of showing that the department's findings are not supported by the evidence or that its recommendation as to the appropriate degree of discipline is erroneous or unlawful. (*In re Ford, supra,* 44 Cal.3d at pp. 815-816.) Berman must demonstrate that the charges of unprofessional conduct are not sustained by convincing proof and to a reasonable certainty. (*Kapelus* v. *State Bar* (1987) 44 Cal.3d 179, 184 [242 Cal.Rptr. 196, 745 P.2d 917].)

Berman does not deny that the facts, as set forth in the record, occurred. Nor does he assert that the department's recommendation of disbarment is erroneous or unlawful in light of the facts. Rather, his only contention is that the recordings and transcripts of the telephone conversations and meetings were improperly admitted into evidence at his disciplinary hearing. He seeks to have his case remanded for reconsideration absent the recordings and transcripts.

Berman asserts that the recordings and the transcripts made from the recordings were inadmissible under Penal Code section 632.[3] Penal Code

---

[3] Penal Code section 632 states in relevant part: "(a) Every person who, intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device, eavesdrops upon or records the confidential communica-

section 632, subdivision (a), prohibits a party to a confidential communication from recording a conversation without the consent of the other party to the communication. It applies to confidential communications occurring over the telephone or while the parties are in each other's presence. Evidence obtained in violation of this statute is inadmissible in "any judicial, administrative, legislative, or other proceeding." (Pen. Code, § 632, subd. (d).) Berman contends that the recordings made by the FBI agents violated Penal Code section 632, because he intended the conversations with the FBI agents to be private and did not know or consent to the conversations being recorded. ■ ■■■■ Thus, Berman concludes that the recordings and the transcripts of the recordings should not have been admitted as evidence at his disciplinary hearing.[4]

■ It is unnecessary to address Berman's contentions because, even assuming the inadmissibility of the recordings and the transcripts, there is sufficient evidence to support the department's findings. Agent Hanlon testified for approximately one and a half days regarding the undercover investigation of Berman. Because he participated in the relevant meetings and telephone conversations, Hanlon was able to testify from personal knowledge as to the substance of the investigation. Furthermore, he was the only witness at Berman's disciplinary hearing, and Berman introduced no evidence materially contradicting agent Hanlon's testimony.

Agent Hanlon testified that at the November 2, 1982, meeting he introduced Berman to agent Cassidy, who was represented as being engaged in the drug business, and that Berman explained the details of the money

---

tion, whether the communication is carried on among such parties in the presence of one another or by means of a telegraph, telephone or other device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500), or imprisonment in the county jail not exceeding one year or in the state prison, or by both that fine and imprisonment . . . . [¶] (b) The term 'person' includes an individual, business association, partnership, corporation, or other legal entity, and an individual acting or purporting to act for or on behalf of any government or subdivision thereof, whether federal, state, or local, but excludes an individual known by all parties to a confidential communication to be overhearing or recording the communication. [¶] (c) The term 'confidential communication' includes any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, executive or administrative proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded. [¶] (d) Except as proof in an action or prosecution for violation of this section, no evidence obtained as a result of eavesdropping upon or recording a confidential communication in violation of this section shall be admissible in any judicial, administrative, legislative, or other proceeding. . . ."

[4] The hearing referee held that the recordings and transcripts were admissible because they involved communications reflecting an intent to violate the law and therefore were not "confidential" within the meaning of section 632, subdivision (c). This definition of "confidential communication" is not consistent with the one provided in subdivision (c).

laundering scheme. Agent Hanlon also testified about his participation in the November 16, 1982, meeting with Berman, agent Cassidy and Vincent Coniglio. He testified that at the meeting Berman again outlined the money laundering scheme and that agent Cassidy indicated his willingness to invest large sums of money in the operation. Finally, agent Hanlon testified that at the December 6, 1982, meeting, which occurred after Berman was informed of the unsuccessful attempt to carry money into Canada, Berman outlined alternative plans for moving money out of the United States through United States branch offices of the Royal Bank of Canada or banks located in Mexico.

Agent Hanlon also gave testimony regarding many of the key telephone conversations he participated in with Berman. For example, agent Hanlon stated that during a telephone conversation occurring sometime subsequent to November 2, 1982, Berman sought his help in updating the combined financial statement of Champion Mortgage and Energy Plus. Agent Hanlon testified that in two separate telephone conversations he told Berman that the financial statement would contain false information, and that during one telephone conversation they discussed, and settled upon, how much cash the financial statement should show. Agent Hanlon testified that Berman instructed him to give the altered financial statements to his contacts in the Florida banking industry. In sum, the substance of agent Hanlon's testimony is sufficient to support the relevant findings of fact made by the department, especially since Berman does not contest the validity of these facts.

■ Still assuming that the recordings and transcripts are inadmissible, the fact that agent Hanlon used them to refresh his memory does not affect the admissibility of his testimony. ■ When a writing is used to refresh a witness's memory, the writing itself has no independent evidentiary value for the party calling the witness and is not admissible into evidence at that party's instance.[5] (3 Witkin, Cal. Evidence (3d ed. 1986) § 1835, p. 1792.) ■ Memory may be refreshed using a writing that is not admissible into evidence. (See *People* v. *Wojahn* (1959) 169 Cal.App.2d 135, 141-142 [337 P.2d 192]; 3 Witkin, Cal. Evidence, *supra,* § 1833, pp. 1790-1791.) Evidence Code section 771, subdivision (a), merely requires that "if a witness, either while testifying or prior thereto, uses a writing to refresh his memory with respect to any matter about which he testifies, such writing must be produced at the hearing at the request of an adverse party and, unless the writing is so produced, the testimony of the witness concerning such matter

---

[5] Present recollection *refreshed* should be distinguished from past recollection *recorded,* where the writing has independent evidentiary value. For past recollection recorded the witness must have insufficient present recollection to enable him or her to testify fully and accurately. (See Evid. Code, § 1237.) If the writing meets the requirements set forth in Evidence Code section 1237, subdivision (a), then it may be read into evidence at the instance of the party calling the witness.

shall be stricken."[6] The recordings and transcripts in this case were apparently made available to Berman by at least the time of trial. Consequently, agent Hanlon's use of the transcripts to refresh his memory was not improper.

## IV. CONCLUSION

■ The facts reveal that Berman used his legal skills to propose a plan that would result in the laundering of money that he believed to be obtained through the sale of drugs. The facts also indicate that Berman sought to have financial statements that he believed would contain false information given to banks in order to obtain loans and lines of credit for his company. Berman's *belief* that the financial statements contained false information reflects sufficient indicia of fraudulent intent to constitute moral turpitude. (See *In re Hallinan* (1954) 43 Cal.2d 243, 247-248 [272 P.2d 768].)

The only evidence offered by Berman in mitigation were the facts that he is 63 years old and has 3 children. This must be viewed in light of the aggravating circumstance that Berman was publicly reproved by the State Bar of California on May 17, 1982, for willfully failing to perform all the services for which he was retained. We agree with the department that, while this infraction is remote as to subject matter, it is not remote as to time. In short, Berman's conduct was "inimical both to the high ethical standards of honesty and integrity required of members of the profession and to promoting confidence in the trustworthiness of members of the legal profession." (*In re Bloom* (1987) 44 Cal.3d 128, 136 [241 Cal.Rptr. 726, 745 P.2d 61].)

In light of the seriousness of his actions and the mitigating and aggravating circumstances, it is ordered that petitioner Burton Robert Berman be disbarred and that his name be stricken from the roll of attorneys in this state. It is further ordered that he comply with the requirements of rule 955 of the California Rules of Court, and perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, of the effective date of this order. This order is effective upon the finality of this decision in this court.

Petitioner's application for a rehearing was denied May 24, 1989.

---

[6] If the writing is produced at the hearing, then Evidence Code section 771, subdivision (b), allows the adverse party to inspect the writing, to cross-examine the witness concerning the writing, and to introduce into evidence pertinent parts of the writing.