[No. S010170. Apr. 5, 1990.]

MARTIN LOUIS STANLEY, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Theodore A. Cohen for Petitioner.

Eliseo Gauna, Quattrin, Johnson, Campora & England, David B. Johnson, Jones, Brown, Clifford & McDevitt and Edwin T. Caldwell as Amici Curiae on behalf of Petitioner.

Diane C. Yu, Truitt A. Richey, Jr., Richard J. Zanassi, Lawrence C. Yee and Erica Tabachnick for Respondent.

**OPINION**

**THE COURT.**—Petitioner, Martin Louis Stanley, seeks review of a decision of the Review Department of the State Bar Court (the department)

recommending that he be disbarred from the practice of law in California. Although petitioner acknowledges that he committed more than 30 acts of misconduct against more than 20 separate clients, and misappropriated a total of more than $20,000, he contends that in light of the considerable mitigating evidence which he has presented, demonstrating his rehabilitation from the alcohol and drug addiction that led to his misconduct, disbarment is unwarranted. In view of the number and seriousness of petitioner's acts of misconduct, we adopt the department's recommendation of disbarment.

## FACTS

### A. *Matters of Culpability.*

The record demonstrates that one year after his admission to the practice of law in California on February 5, 1982, petitioner began a course of professional and ethical misconduct which extended over a period of several years, harmed numerous clients and nonclients, and included three convictions for crimes involving moral turpitude.

### 1. *Petitioner's Misconduct.*

From July 1983 through January 1986, petitioner committed professional and ethical violations in at least 34 separate matters. In all, petitioner misappropriated between $20,000 and $30,000, and abandoned over 20 clients.

### (a) *Fraudulent Misrepresentation.*

Petitioner obtained the names of seven clients from various attorneys' answering services,[1] contacted the clients and falsely represented that he was associated with these attorneys. He collected advance fees from the clients. He then failed to render services to the clients, failed to communicate with them to refund unearned fees and misappropriated the funds in an amount totaling $2,035 for his own use and purpose.

### (b) *Misappropriation.*

Petitioner collected advance fees from 16 of his own clients but failed to perform or failed to complete the services for which he was retained. He

---

[1] Petitioner testified that he would call up an attorney's answering service, represent himself to be the attorney and request all messages, which messages often included the names of individuals seeking legal assistance.

failed to communicate with his clients, failed to return unearned fees and misappropriated a total of $7,173.

Petitioner negotiated settlements on behalf of four of his clients, received the settlement funds from the insurance companies, forged the signatures of his clients on the settlement checks and cashed the checks. He did not notify his clients of any of these matters. In this manner he misappropriated funds totaling $6,513.

In one matter petitioner falsely advised the opposing party from whom he had received a settlement check that the check had been lost. In fact, petitioner had already cashed the check. Petitioner thereafter collected a replacement check, forged his client's signature on the check, negotiated the check and again misappropriated the funds for his own use.

Petitioner issued checks drawn on insufficient funds from his client trust account and general office account in amounts totaling almost $7,000. At the time petitioner issued the checks, he knew that the accounts either contained insufficient funds to support the checks or had been previously closed.

Additionally, petitioner failed to render an accounting to his clients of funds received on their behalf and failed to make timely restitution to the recipients who were entitled to the funds.

(c) *Abandonment.*

Petitioner abandoned and failed to communicate with over 20 clients. Petitioner's acts of abandonment caused significant harm to his clients and to the administration of justice. The record demonstrates, for example, that in one matter, the Tarakilish matter, petitioner was paid $1,500 to bail a client out of jail. Petitioner took the money, but failed to perform any services to obtain his client's release. Consequently the client, who was released the next day when charges were dismissed, had to spend the night in custody.

In the Goldberg matter, petitioner was paid a fee to represent the client in an unlawful detainer matter. Although petitioner took the fee, he failed to perform any services and the client was evicted from his residence.

In the Hurd, Searls and Berrientos matters, petitioner was paid to represent his clients in their respective criminal matters. Petitioner took the fees but thereafter failed to appear at the scheduled court hearings. As a result, bench warrants were issued for the arrest of his clients. In at least one of

these matters, Berrientos, the client, was arrested on the authority of the bench warrant.

In the Fleshman matter, petitioner failed to appear at a scheduled court hearing, and a bench warrant was issued for her arrest. The court, however, had to continue the matter to allow Fleshman to obtain new counsel.

The State Bar Court concluded that the facts and circumstances surrounding the instances of misconduct involved moral turpitude and constituted a violation of petitioner's oath and duties as an attorney.

2. *Petitioner's Criminal Convictions.*

(a) *1986 Criminal Conviction for Having Violated Penal Code Section 476a, Subdivision (a), a Crime Involving Moral Turpitude.*

On February 26, 1986, petitioner was charged in a thirteen-count misdemeanor complaint with four counts of having violated Penal Code section 459 (burglary); four counts of having violated Penal Code section 487, subdivision 1 (grand theft); four counts of having violated Penal Code section 484 (larceny); and one count of having violated Penal Code section 476a, subdivision (a) (passing checks issued on insufficient funds).

Petitioner pleaded nolo contendere to a misdemeanor violation of Penal Code section 476a, subdivision (a) (passing a check on insufficient funds). Petitioner stipulated that he purchased a television set from a Sears store and paid for it by a check drawn on a "clients fund account" at First Interstate Bank. At the time petitioner issued the check, the account had been closed for some time.

Petitioner later purchased another television set from a different Sears store and paid for it by check drawn on that same closed clients trust account. He then returned the television set and received a cash refund of $425.99. Petitioner purchased another television set with another check drawn on the same closed clients fund account. However, law enforcement officials were present, observed the entire transaction and arrested him.

After the plea, the court sentenced petitioner to 120 days in county jail, with 60 days' credit for time served. The court further placed petitioner on probation for a period of three years, subject to certain conditions including full restitution to the store.[2]

---

[2] Pursuant to the court's order of restitution, petitioner made full restitution to the store in March 1987.

On February 11, 1987, after finality of the judgment of conviction, we ordered that petitioner be suspended from the practice of law pending final disposition of the disciplinary proceedings. We referred the matter to the State Bar Court for a hearing, report and recommendation as to the degree of discipline to be imposed.

(b) *1986 Criminal Conviction for Having Violated, Inter Alia, Penal Code Section 484f, a Crime Involving Moral Turpitude.*

On February 12, 1986, petitioner pled nolo contendere and was convicted of having violated (1) Penal Code section 484f, a crime involving moral turpitude, in that he did willfully and unlawfully, with the intent to defraud, sign the name of another person to a credit card slip; and (2) Health and Safety Code section 11550, in that he did willfully and unlawfully use and come under the influence of a controlled substance. On February 12, 1986, petitioner was placed on a diversion program for 36 months on conditions that required him to abstain from the use or possession of narcotics, dangerous or restricted drugs or associated paraphernalia; to stay away from places where drug users congregated; to cooperate with his probation officer in a plan for curbing his drug abuse; and to obey all rules and orders of the court.

On February 3, 1987, a notice of lack of appeal was filed with the State Bar Court and transmitted to us. By order filed on April 15, 1987, effective May 15, 1987, this court ordered that petitioner, having violated Penal Code section 484f, a crime involving moral turpitude, be suspended from the practice of law pending disposition of the disciplinary proceedings. We referred the matter of petitioner's criminal conviction to the State Bar for hearing, report and recommendation as to the degree of discipline to be imposed.

(c) *1986 Criminal Conviction for Having Violated Penal Code Sections 476a, Subdivision (a) and 487, Subdivision 1, Crimes Involving Moral Turpitude.*

In March 6, 1986, petitioner was charged in a criminal information filed in the Los Angeles County Superior Court with five felony counts of having violated Penal Code section 476a, subdivision (a) (passing checks issued on nonsufficient funds) and one count of having violated Penal Code section 487, subdivision 1 (grand theft). From December 1984 through November 1985, petitioner issued approximately 41 checks, all of which were in the amount of $50 and made payable to "Cash." All checks were drawn against an account at the Los Angeles County Civic Center Credit Union, which account did not have sufficient funds to cover the checks.

Petitioner cashed all of the checks at various times at branches of the Security Pacific Bank, knowing that when he cashed the checks, there were insufficient funds in his account to cover the checks.[3]

On June 3, 1986, petitioner pled guilty to all six counts set forth in the information. Petitioner was sentenced to 114 days in the county jail, with 114 days' credit for time served, and was placed on probation for a period of 5 years subject to conditions that included restitution and continued attendance at Alcoholics Anonymous meetings.

On October 28, 1987, a notice of lack of appeal was filed with the State Bar Court and transmitted to this court. On January 14, 1987, we referred the matter of petitioner's criminal conviction to the State Bar for a hearing, report and recommendation as to the degree of discipline to be imposed.

In sum, petitioner's criminal record indicates that petitioner has been convicted of violations of Penal Code section 487, subdivision 1 (grand theft); Penal Code section 476a, subdivision (a) (issuance of check on insufficient funds); Penal Code section 484f (unlawful use of a credit card); and Health and Safety Code section 11550 (being under the influence of a controlled substance).

B. *Evidence in Mitigation.*

1. *Petitioner's Account.*

Petitioner testified that he began using alcohol and was introduced to illegal drugs during his undergraduate education, and that he began experimenting with quaaludes and LSD, and began using marijuana and alcohol on a daily basis. Petitioner's alcohol and drug use became heavier during law school. Despite his addiction, petitioner passed the bar examination in 1982, and began practice as a sole practitioner. Petitioner testified that he was an addict from the first day he started his practice.

By 1983 petitioner was unable to function. He began to use Iranian heroin in addition to the alcohol, cocaine, valium, placidyl and other drugs

---

[3] The information charged that petitioner wilfully, unlawfully and fraudulently cashed 41 checks totalling $2,050. However, the total amount fraudulently obtained by petitioner, as uncovered in a criminal investigation and proved at a preliminary hearing, totalled $5,450. Petitioner testified that he cashed approximately 150 checks at $50 each. Petitioner testified that he had a check guaranty card and would write checks in $50 denominations because that was the maximum amount he could cash with his guaranty card. Petitioner further testified that he wrote five to six checks a day for a period of approximately two months.

to which he was accustomed.[4] Petitioner's mother, also his legal secretary, stopped working for him, after which petitioner could not handle the paperwork of his practice and could not function in his capacity as an attorney responsible for a practice.

During the times that his acts of misconduct occurred, petitioner was under the influence of alcohol or drugs. Petitioner admitted that he stole money from his clients and stated that he felt very badly about this conduct. Currently petitioner owes over $15,000 to the federal government for a loan that he failed to repay, and he owes approximately $2,000 in private loans that he also failed to repay.

Petitioner admitted he received letters from the State Bar regarding various clients but testified that he thought he had been disbarred and was in such a state of panic that he did not even try to respond to the letters.

Following his conviction in 1986, petitioner spent 30 days in jail, during which time he used no alcohol or illegal drugs. After his release, however, he continued to use heroin on an occasional basis. As a result of his subsequent conviction for issuing bad checks, petitioner spent another 117 days in jail. Again he used no alcohol or drugs during his incarceration. After his release, however, petitioner was depressed and started drinking alcohol and smoking marijuana.

Petitioner was placed on an eight-month diversion program during which time he was subject to random urine testing. He successfully completed the program. On the recommendation of his mother, petitioner contacted Alcoholics Anonymous (AA) and attended his first AA meeting in spring 1986. He has not used drugs or alcohol since that time.

Petitioner has worked as a law clerk for several attorneys. He has also volunteered his services to various legal clinics, performed services for AA and addressed different groups on the issue of substance abuse.

Petitioner has placed approximately $5,000 in trust for restitution of the funds wrongfully obtained, and plans to make full restitution.

Interestingly, petitioner testified that if he were deciding the appropriate degree of discipline to be imposed, he would likely vote for disbarment.

---

[4] Petitioner described himself as a "walking pharmacy. I had every drug inside my body that there was. I used valium on a daily basis. I used every drug there was. . . . And it got to the point that after a while, I wore down. I couldn't function any more."

### 2. *Testimony of Dr. O'Connor.*

Dr. Garrett O'Connor, a psychiatrist who has treated individuals with alcohol and other drug dependencies, evaluated petitioner and concluded that petitioner was severely addicted to "cocaine, free-base cocaine, heroin, alcohol and a variety of other drugs." Dr. O'Connor believed that petitioner's conduct was the direct result of his addiction. While his prognosis was very good, Dr. O'Connor recommended very strongly that petitioner work in close association with other lawyers experienced with addicts who would agree to monitor petitioner's progress. He cautioned that *under no circumstances* should petitioner be permitted to work as a sole practitioner.

The doctor suggested that with proper treatment and monitoring,[5] an 80 percent to 85 percent recovery rate can be achieved over a two- to five-year period. Dr. O'Connor stated that he would feel comfortable if petitioner continued without any additional monitoring but that petitioner would probably have a better chance to succeed if he had a "bit of professional help as well."

### 3. *Testimony of Petitioner's Character Witnesses.*

Petitioner offered the testimony of several witnesses who, for the most part, are acquainted with petitioner through the AA program and who have known petitioner for about one year. These witnesses testified primarily as to petitioner's rehabilitation. In addition, petitioner offered the testimony of four witnesses who worked with him and have known him for about one year. These witnesses also testified as to petitioner's rehabilitation.

### 4. *Findings.*

The department's recommendation that petitioner be disbarred was adopted by a vote of nine to five,[6] and represents a modification of the

---

[5]Dr. O'Connor compared petitioner's situation with the treatment and monitoring of airline pilots addicted to alcohol or other drugs and set forth several standards that had to be met by these pilots, including random urine testing and monthly meetings with their physicians.

[6]The dissenting members stated that in their view a period of extended actual suspension, followed by petitioner's compliance with the provisions of standard 1.4(c)(ii), Standards for Attorney Sanctions for Professional Misconduct (Rules Proc. of State Bar, div. V), "more adequately protects the public while recognizing the great seriousness of [petitioner's] offenses in light of the extraordinary showing of [petitioner's] mitigation and rehabilitation." Standard 1.4(c)(ii) provides: "Normally, actual suspensions imposed for a two (2) year or greater period shall require proof satisfactory to the State Bar Court of the member's rehabilitation, present fitness to practice and present learning and ability in the general law before the member shall be relieved of the actual suspension. . . ."

degree of discipline recommended by a three-member hearing panel of the State Bar Court (hearing panel). The hearing panel, by a vote of two to one,[7] recommended that petitioner be suspended from the practice of law for a period of five years; that execution of suspension be stayed; and that petitioner be placed on probation for said period subject to certain conditions including, inter alia, actual suspension of three years or until specified restitution requirements had been fulfilled, continued participation in the State Bar's Pilot Program on Alcohol Abuse, abstinence from the use and possession of intoxicants and any narcotics, dangerous or restricted drugs or associated paraphernalia, compliance with rule 955, California Rules of Court, and the taking and passing of the Professional Responsibility Examination prior to the expiration of the period of actual suspension.

DISCUSSION

Petitioner argues only that the discipline imposed is excessive. We disagree. In attorney disciplinary matters, the appropriate degree of discipline may only be determined after this court reviews all relevant factors on a case-by-case basis. (*Hawk* v. *State Bar* (1988) 45 Cal.3d 589, 602 [247 Cal.Rptr. 599, 754 P.2d 1096]; *Franklin* v. *State Bar* (1986) 41 Cal.3d 700, 710 [224 Cal.Rptr. 738, 715 P.2d 699].) We have reviewed all the relevant factors and conclude that in view of the number and seriousness of petitioner's acts of misconduct, disbarment is appropriate.

### A. *Misappropriation and Theft of Funds.*

Petitioner's misappropriation of client funds alone constitutes a serious ethical and moral violation, breaches the high duty of loyalty that attorneys owe their clients, and puts in peril the public confidence in the practice of law. This court has long held that, absent compelling mitigating circumstances, misappropriation of client trust funds by an attorney warrants disbarment. (*In re Basinger* (1988) 45 Cal.3d 1348, 1358 [249 Cal.Rptr. 110, 756 P.2d 833]; *In re Vaughn* (1985) 38 Cal.3d 614, 618-619 [213 Cal.Rptr. 583, 698 P.2d 651]; *In re Abbott* (1971) 19 Cal.3d 249, 253-254 [137 Cal.Rptr. 195, 561 P.2d 285].)

The Standards for Attorney Sanctions for Professional Misconduct (Rules Proc. of State Bar, div. V [hereafter Standards; all further references to standards are to this source]) similarly suggest that the willful misappropriation of entrusted client funds should result in disbarment unless the

---

[7]The dissenting referee thought disbarment would be the appropriate discipline in light of petitioner's misconduct.

funds are insignificantly small or the most compelling mitigating circumstances clearly predominate.

### B. *Criminal Convictions.*

Not only did petitioner steal from clients, his dishonesty in his personal life resulted in several convictions for crimes of moral turpitude.

██ Under sections 6101 and 6102 of the Business and Professions Code, disbarments, and not suspensions, have been the rule rather than the exception in cases of serious crimes involving moral turpitude, the purpose of the statutes being to protect the public, as well as the courts and the legal profession. (See *In re Basinger, supra*, 45 Cal.3d 1348; *In re Ford* (1988) 44 Cal.3d 810 [244 Cal.Rptr. 476, 749 P.2d 1331]; see also *In re Bogart* (1973) 9 Cal.3d 743, 748 [108 Cal.Rptr. 815, 511 P.2d 1167].) ██ The crimes of which petitioner was convicted (three counts of grand theft and three counts of forgery) are serious crimes and warrant disbarment. As stated by this court in *In re Smith* (1967) 67 Cal.2d 460, 462 [62 Cal.Rptr. 615, 432 P.2d 231], the crime of "grand theft . . . [has] been recognized to involve heinous misconduct for an attorney, and in *In re Urias* [1966] 65 Cal.2d 258, 262, fn. 5 [53 Cal.Rptr. 881, 418 P.2d 849] . . . we noted that 'the vast majority of grand theft convictions of attorneys since that date [1955] have resulted in disbarment or resignation with prejudice.' " (67 Cal.2d 460, 462-463.)

### C. *Client Abandonment.*

██ Client neglect is serious misconduct that constitutes a breach of the fiduciary duty owed by an attorney to the client and, accordingly, warrants substantial discipline. (*Farnham* v. *State Bar* (1988) 47 Cal.3d 429, 446 [253 Cal.Rptr. 249, 763 P.2d 1339].) It is well recognized that "[h]abitual disregard by an attorney of the interests of clients is ground for disbarment. . . . Even when such neglect is grossly negligent or careless, rather than willful and dishonest, it is an act of moral turpitude and professional misconduct, justifying disbarment. . . ." (*Farnham* v. *State Bar, supra*, 47 Cal.3d at p. 446, quoting *Simmons* v. *State Bar* (1970) 2 Cal.3d 719, 729 [87 Cal.Rptr. 368, 470 P.2d 352], quoting *Grove* v. *State Bar* (1967) 66 Cal.2d 680, 683-684 [58 Cal.Rptr. 564, 427 P.2d 164], internal quotation marks omitted; see *Cooper* v. *State Bar* (1987) 43 Cal.3d 1016, 1031-1032 [239 Cal.Rptr. 709, 741 P.2d 206]; *Kent* v. *State Bar* (1987) 43 Cal.3d 729, 735 [239 Cal.Rptr. 77, 739 P.2d 1244].) The failure to communicate with, and inattention to the needs of, a client, may also constitute proper grounds for discipline. (*Kapelus* v. *State Bar* (1987) 44 Cal.3d 179, 187-188 [242 Cal.Rptr. 196, 745 P.2d 917].)

Standard 2.4 further suggests that disbarment is warranted. It provides, in relevant part, as follows: "Culpability of a member of a pattern of wilfully failing to perform services demonstrating the member's abandonment of the causes in which he or she was retained shall result in disbarment."

 Here, petitioner abandoned over 20 clients and failed to communicate with at least 21 clients. Petitioner's acts of misconduct far exceeded the scope of the misconduct in *Grove, supra,* 66 Cal.2d 680 (ten counts of misconduct, attorney disbarred), *Ridley* v. *State Bar* (1972) 6 Cal.3d 551, 560 [99 Cal.Rptr. 873, 493 P.2d 105] (misconduct in six matters, attorney disbarred), *Kent, supra,* 43 Cal.3d 729 (misconduct involving six clients, attorney disbarred), and *Cooper, supra,* 43 Cal.3d 1016 (misconduct in six matters, attorney disbarred).

D. *Dishonesty, Deceit, and Fraud.*

Also egregious were the multiple acts of dishonesty and deceit over an extended period of time. Petitioner lied about his identity in order to obtain clients from other attorneys and deceived the clients by misrepresenting his association with the attorney. Petitioner falsely advised the opposing party from whom he had received a settlement check that the check had been lost when, in fact, petitioner had actually cashed the check; petitioner misrepresented to his clients that he was properly performing services when, in fact, he had failed to perform such services.

Such dishonest conduct is inimical to both the high ethical standards of honesty and integrity required of members of the legal profession and to promoting confidence in the trustworthiness of members of the profession. (*Levin* v. *State Bar* (1988) 47 Cal.3d 1140, 1147 [255 Cal.Rptr. 422, 767 P.2d 689]; *In re Bloom* (1987) 44 Cal.3d 128, 135-136 [241 Cal.Rptr. 726, 745 P.2d 61]; see *Kent* v. *State Bar, supra,* 43 Cal.3d at p. 732; *Toll* v. *State Bar* (1974) 12 Cal.3d 824, 831, fn. 7 [117 Cal.Rptr. 427, 528 P.2d 35]; standard 2.3 of the Standards.)

Petitioner's acts of misconduct were recent, took place over an extended period of time, and affected numerous clients and nonclients. In light of the extremely serious nature of his misconduct, and in the absence of the most compelling mitigating circumstances, disbarment is appropriate.

### E. *Factors in Mitigation.*

■ Petitioner's burden is to demonstrate that the department's recommendation is erroneous or unlawful. (*In re Demergian* (1989) 48 Cal.3d 284, 293 [256 Cal.Rptr. 392, 768 P.2d 1069].)[8]

Petitioner's period of recovery is brief, as was his practice of law, and his problem with drugs is deplorable in itself. We have rejected similar claims in mitigation in *In re Demergian, supra,* 48 Cal.3d 284, in which we disbarred an attorney who had been convicted of misdemeanor grand theft.

We gave little weight to the attorney's youthfulness, his lack of prior discipline and his assertion that his conduct was controlled by cocaine use. ■ We held that these circumstances did not weigh in the attorney's favor, where his cocaine use began less than four years after his admission to the bar, and his misappropriation began shortly thereafter. "A blemish-free record of such relatively short duration is entitled to little weight in mitigation. [Citations.]" (*In re Demergian, supra,* 48 Cal.3d at pp. 294-295.) ■ Further, we held that cocaine use is hardly a mitigating factor. Petitioner became addicted through voluntary use of an illicit drug. (Cf., *In re Nadrich* (1988) 44 Cal.3d 271, 276 [243 Cal.Rptr. 218, 747 P.2d 1146] [drug addiction resulted from legitimate medical treatment].) We concluded, that "[a]part from petitioner's subsequent rehabilitative efforts, his use of cocaine increases the danger he presents to the public, the courts, and the reputation of the legal profession." (48 Cal.3d at p. 295.)

Similarly, in *Rosenthal* v. *State Bar* (1987) 43 Cal.3d 658 [238 Cal.Rptr. 394, 738 P.2d 740], an attorney who had misappropriated several thousand dollars from five clients argued that he was fit to practice law after having undergone treatment for substance abuse. In ordering that the attorney, who had apparently recovered from drug addition, be disbarred, we concluded that "[a]lthough recovery from substance abuse is a proper factor for this court to consider in reaching its decision [citation], protection of the public is our foremost concern." (*Rosenthal, supra,* at pp. 663-664.)

---

[8] Disbarment has been ordered by this court in other cases where similar or more compelling mitigating circumstances have been present. (See, e.g., *In re Demergian, supra,* 48 Cal.3d 284; *Tarver* v. *State Bar* (1984) 37 Cal.3d 122 [207 Cal.Rptr. 302, 688 P.2d 911] [alcoholism and rehabilitation efforts; death of attorney's first wife and injuries to children resulting from accident; marital difficulties with second wife]; *Tomlinson* v. *State Bar* (1975) 13 Cal.3d 567 [119 Cal.Rptr. 335, 531 P.2d 1119] [severe financial problems; no prior disciplinary record after many years of practice; willingness to make restitution]; *Tardiff* v. *State Bar* (1971) 3 Cal.3d 903 [92 Cal.Rptr. 301, 479 P.2d 661] [severe financial pressures arising in part from the hospitalization of attorney's two children]; *Bambic* v. *State Bar* (1985) 40 Cal.3d 314 [219 Cal.Rptr. 489, 707 P.2d 862]; *Rimel* v. *State Bar* (1983) 34 Cal.3d 128 [192 Cal.Rptr. 866, 665 P.2d 956]; *Resner* v. *State Bar* (1960) 53 Cal.2d 605 [2 Cal.Rptr. 461, 349 P.2d 67].)

■ Petitioner's misconduct in the present proceeding was far more egregious than the misconduct committed by the attorney in *Rosenthal.* In light of the intensity of petitioner's long-term addiction, the extent to which he abandoned himself, his clients and the profession, and the substantial harm caused by his numerous and repeated acts of misconduct over an extended period of time, petitioner's evidence of recovery is not yet sufficient to permit us to confidently predict that his wrongdoing will not be repeated.

We cannot overlook the gravity and scope of the dishonesty disclosed in this case. As we held in *In re Strick* (1987) 43 Cal.3d 644 [238 Cal.Rptr. 397, 738 P.2d 743], "[w]hile petitioner's rehabilitation is properly considered as a mitigating factor [citation], the degree of discipline *must correspond to some reasonable degree with the gravity of the misconduct.*" (*Id.* at p. 656, italics added.) A record which evidences approximately twenty separate cases of misappropriation, failure to communicate with and abandonment of clients, failure to refund unearned fees, numerous acts of dishonesty, fraud and deceit, and three separate criminal convictions (two misdemeanors and one felony) for crimes involving moral turpitude—all in a two and one-half year period—warrants nothing less than disbarment.

Petitioner strenuously argues that the discipline recommended by the hearing panel is sufficient to protect the public, maintain the integrity of the legal profession and preserve public confidence in the legal profession. He challenges the conclusion that he is unable to practice law without close supervision and strict probation conditions. He asserts that he did not intend to suggest that he is presently unfit to practice law when he testified that his career as a lawyer "is kind of over with," and that he would prefer to work in a small firm and is "not able to deal with clients, take the negotiating fees, stuff like that." He asserts that he should not be penalized for his honesty before the hearing panel.

It is true that the primary purpose of disciplinary sanctions is not punishment. Rather, sanctions are imposed to ensure the protection of the public, the courts, and the legal profession, the maintenance of high professional standards by its members and the preservation of public trust in the legal profession. (Standards, standard 1.3; see also *Mepham* v. *State Bar* (1986) 42 Cal.3d 943, 948 [232 Cal.Rptr. 152, 728 P.2d 222]; *In re Nevill* (1985) 39 Cal.3d 729, 736 [217 Cal.Rptr. 841, 704 P.2d 1332]; *Bradpiece* v. *State Bar* (1974) 10 Cal.3d 742, 748 [111 Cal.Rptr. 905, 518 P.2d 337].) Petitioner, however, misconceives the State Bar's position. The concern about his fitness stems neither from its desire to punish him nor from any unwillingness to submit to supervision. Rather, the recommended discipline stems

from the implicit finding of the hearing panel that petitioner is not presently capable of the practice of law without supervision.

Petitioner's emotional problems were serious enough in the past to lead to a drug addiction so overwhelming that he was willing to risk injury to his clients and betray them to obtain the drugs. The combined effect of the drugs and his psychological dysfunction culminated in his physical, emotional and professional deterioration, and ultimately in several arrests and convictions. It is not enough to assess petitioner's current functioning in the abstract. Given petitioner's history, the department is perfectly justified in requiring him to exhibit enough stability over a sustained period of time to assure itself that petitioner is capable of practicing without injury to his clients or neglect of his legal duties.

Petitioner argues that probation with supervision actually affords more protection than disbarment, given the possibility of petitioner's imminent reinstatement. It is true that petitioner will be able to apply for reinstatement. Petitioner's reinstatement, however, is not automatic. He must first pass the Professional Responsibility Examination and establish to the satisfaction of a majority of the hearing panel: "(1) rehabilitation and present moral qualifications for readmission, and (2) present ability and learning in the general law." (Rules Proc. of State Bar, rule 667.) ■ After one is disbarred, the burden of proving good moral character is higher than when first admitted. (*Kepler* v. *State Bar* (1932) 216 Cal 52, 55 [13 P.2d 509].) While we express no opinion as to the likelihood that petitioner will meet this burden, we find that the standard for reinstatement adequately protects the interests of the public and the profession. (See *In re Nevill, supra,* 39 Cal.3d 729, 738-739.)

## CONCLUSION

■ Although petitioner's rehabilitative efforts are commendable, we adopt the State Bar's recommendation of disbarment, with the concomitant requirement of long-term evaluation to be reinstated to practice. Accordingly, we order petitioner Martin Louis Stanley disbarred from the practice of law in California. This order is effective upon finality of this decision in this court. (See Cal. Rules of Court, rule 24(a).)

Petitioner's application for a rehearing was denied May 23, 1990, and the opinion was modified to read as printed above.